Abraham Paul **KOROTKI**

v.

**ATTORNEY SERVICES CORPORATION INC., et al.**

No. K–94–1212.

United States District Court, D. Maryland.

June 12, 1996.

Irwin R. Kramer, Owings Mills, Maryland, for plaintiff.

S. Todd Wilson, Terri L. Goldberg, and Eccleston and Wolf, Baltimore, Maryland, for defendants Thomas, Ronald & Cooper and Daniel V. Schmitt.

Sheila Brooks–Tahir, Baltimore, Maryland, for defendant Attorney Services Corporation.

FRANK A. KAUFMAN, Senior District Judge.

Plaintiff alleges that defendants violated the Federal Fair Credit Reporting Act (FCRA)[1] and the Maryland Consumer Credit Reporting Agencies Act (CCRAA)[2] when they acquired plaintiff's credit report in order to obtain an additional address at which to serve plaintiff with certain legal papers. Plaintiff also contends that defendants committed the tort of invasion of privacy. This Court has federal question jurisdiction over plaintiff's FCRA claim. 28 U.S.C. § 1331. Because plaintiff's remaining claims arise from the same case or controversy as his FCRA claim, this Court has supplemental jurisdiction over those state law claims. 28 U.S.C. § 1367. Pending before this Court are defendants' summary judgment motions and plaintiff's cross motion for summary judgment.

## I. Facts and Procedural History

The relevant and material facts are undisputed. Plaintiff Korotki is the President of APK Development Corporation ("APK"), the developer for a property in Baltimore County, Maryland, known as Old Court Village ("OCV").[3] Korotki, either on his own behalf

---

1. 15 U.S.C. §§ 1681a–1681t (1982).

2. Md.Com.Law Code Ann. § 14–1201 through 14–1218 (1990).

3. Plaintiff's January 5, 1996 Supplemental Memorandum, Ex. L, Aff. of Korotki, ¶ 2. Defendant ASC objects to plaintiff's January 5, 1996 filing, stating that it was untimely submitted. ASC's January 19, 1996 supplemental memorandum at

or on behalf of APK, contracted with Baltimore County to have sewer and water mains and roads installed at OCV in 1991.[4] Baltimore County requested and received bids for the performance of that utility work and awarded the contract to Angelozzi Brothers, Inc. ("Angelozzi"). While Angelozzi was performing the contract, questions arose among Angelozzi, Baltimore County officials and Korotki as to whether the contract required Angelozzi to perform certain compaction services. Korotki told Angelozzi that if the contract did not require Angelozzi to perform those services, Korotki would pay Angelozzi $12,000 to perform them and offered to pay in the form of a 1976 Cadillac Eldorado.[5] Angelozzi apparently later reduced the price to $6,000.

Angelozzi submitted an invoice in the amount of $6,000 to Korotki on May 20, 1993.[6] Korotki apparently refused to pay that invoice, claiming that the original contract between Angelozzi and Baltimore County required Angelozzi to perform the compaction services, and that, in any event, Angelozzi had failed appropriately to perform the work.[7] Angelozzi then hired Defendant Thomas, Ronald & Cooper (TRC), a law firm which Angelozzi had used previously, to collect the disputed $6,000 from Korotki.[8]

Defendant Schmitt, a lawyer with the aforementioned firm, attempted to establish a mechanic's lien against the OCV property and enlisted the aid of Attorney Services Corporation (ASC) to post that property with notice of the lien.

Inadvertently, ASC posted the notice at Korotki's personal residence, instead of on the OCV property. Before Schmitt became aware of ASC's mistake, the 90–day notice period for establishing the mechanic's lien had expired.[9] When Schmitt learned of the mistake on October 8, 1993, Schmitt instructed ASC to serve Korotki personally with papers regarding the mechanic's lien.[10] Despite repeated attempts, ASC was unable to serve Korotki at the addresses which ASC had for him.[11] At that point, ASC contends, Schmitt directed ASC to obtain an alternate address for Korotki from recent credit and DMV reports.[12] ASC, without any specific authorization from Korotki or Schmitt, obtained a credit report from Equifax on October 25, 1995.[13] ASC transmitted a copy of that report to Schmitt. ASC says it so did in order to show that ASC had been working on the case. ASC then destroyed its copy.[14] ASC admits it had no use for the credit information in that report, but was only interested in obtaining an address at which to

---

1. Plaintiff's filing was received in this Court on January 5, 1996, the day it was due, and plaintiff's counsel certified that it was hand-delivered to defendants' counsel on that date. While it was apparently not filed with the Clerk's Office of this Court on that date, ASC has shown no possible prejudice resulting therefrom. For that reason, this Court will consider plaintiff's January 5, 1996 filing.

4. TRC's and Schmitt's January 5, 1996 motion for summary judgment, Ex. 4 at ¶ 8.

5. While plaintiff claims that he had no "personal business relationship" with Angelozzi, see plaintiff's January 5, 1996 supplemental memorandum, Exhibit L, Affidavit of Abraham Paul Korotki at ¶ 16, plaintiff admitted at his deposition, and has not denied at any time, that he made the agreement described. Defendants Schmitt and TRC's January 5, 1996 motion for summary judgment, Exhibit 1, Dep. of Korotki at 74.

6. Defendants Schmitt and TRC's January 5, 1996 motion for summary judgment at 3, ¶ J.

7. Plaintiff's January 5, 1996 supplemental memorandum at 5.

8. ASC's January 5, 1996 motion for summary judgment at 3.

9. Plaintiff's November 22, 1995 cross motion for partial summary judgment, Exhibit G, deposition of Schmitt at 31, lines 7–9.

10. ASC's December 15, 1995 Reply, Exhibit 2, Deposition of Rosen at 79–80.

11. See Defendant ASC's January 5, 1996 filing, Aff. of Rosen.

12. Schmitt may be disputing that contention since he states that he is not sure whether he requested the credit report. Plaintiff's January 5, 1996 supplemental memorandum at 2–3 & n. 3.

13. Counsel for ACS so informed this Court, on the record, during the December 29, 1995 hearing.

14. Plaintiff's November 22, 1995 cross motion for summary judgment, Exhibit A, Dep. of Rosen at 86.

serve Korotki.[15] Likewise, Schmitt made no use of the report.[16] Moreover, Korotki does not allege that ASC, Schmitt or TRC used the credit report for any purpose.

After learning that ASC had obtained his credit report, Korotki filed the present action against ASC on May 9, 1994, alleging wilful and negligent violation of the FCRA, wilful and negligent violation of the Maryland Consumer Credit Reporting Agencies Act (CCRAA), and invasion of privacy. ASC, in turn, sued Schmitt and TRC for indemnification and/or contribution and for negligent misrepresentation. Korotki then amended his complaint to add Schmitt and TRC as defendants, alleging the same claims against both Schmitt and TRC as he had previously alleged against ASC. Finally, Schmitt and TRC cross claimed against ASC for contribution and indemnification.

On November 6, 1995, defendant ASC filed a summary judgment motion against plaintiff. Plaintiff simultaneously opposed that motion and filed a cross-motion for partial summary judgment on liability only. This Court held an on-the-record motions hearing in open court on December 29, 1995 to consider those motions. At that time, the Court afforded Defendants TRC and Schmitt the opportunity to file a summary judgment motion against plaintiff, and those defendants thereafter filed that motion on January 5, 1996. At the aforementioned December 29, 1995 hearing, this Court also invited all parties to submit further filings to this Court regarding various issues.[17]

On January 19, 1996, plaintiff filed a motion regarding TRC's and Schmitt's failure to respond to his second request for production of documents. Plaintiff's second request for documents contained four separate requests. Regarding the first two requests, counsel for TRC and Schmitt represented that she had previously provided to counsel for plaintiff all documents responsive to those requests.

The second two requests sought certain financial information from TRC and Schmitt. According to counsel for plaintiff, such requests were relevant only to plaintiff's claim for punitive damages. This Court delayed ruling on the second two requests until after deciding the aforementioned pending summary judgment motions. Because this Court will decide those motions in favor of defendants, and determine that there is no liability upon any defendant herein, no damage issue need be reached and plaintiffs' motion regarding discovery as to punitive damages is moot.

In several written and oral communications with counsel, this Court afforded the parties opportunities to make additional filings. The final deadline for these filings was March 24, 1996. Having considered all motions filings, this Court will grant summary judgment in favor of defendants and deny plaintiff's summary judgment motion. The summary judgment motion of defendants TRC and Schmitt will be treated as moot.

## II. Summary Judgment Standard

 Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. Material facts are those facts which the substantive law identifies as "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute concerning material facts is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* "A defendant moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that he is entitled to judgment as a matter of law.... Once a

---

**15.** Korotki's November 22, 1995 cross motion for partial summary judgment, Exhibit B, Dep. of Sitnick at 97.

**16.** TRC's and Schmitt's January 5, 1996 memorandum in support of motion for summary judgment, Exhibit 3, Dep. of Schmitt at 56.

**17.** In a letter to this Court dated January 5, 1996, plaintiff stated that "this Court's preliminary views on this case may result from what it observed as shortcomings in presentation rather than the merits of the case itself." To the contrary, this Court is of the opinion that all parties in this case have thoroughly and adequately presented their respective positions.

defendant makes the necessary showing, the plaintiff must go forward and produce evidentiary facts to support his contention." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). In fact, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). However, the non-movant is entitled to have all reasonable inferences drawn in his favor. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970).

### III. Analysis

In deciding the pending motions, this Court must address four issues. First, is the report ASC obtained from Equifax on October 25, 1993 a "consumer report" to which the FCRA applies?[18] Second, if so, what does the FCRA require of defendants herein? Third, have the defendants failed to comply with those requirements? Fourth, are defendants liable to plaintiff on any of plaintiff's state law claims?

### A. Consumer Report

15 U.S.C. § 1681a(d) defines a consumer report as

any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title.

That definition occasions the need to inquire into the motive of the credit reporting agency, here Equifax, because "if at the time the information was collected, the agency expected it to be used for proper purposes, a transmittal of that information would be a consumer report." *Heath v. Credit Bureau of Sheridan, Inc.*, 618 F.2d 693, 696 (10th Cir.1980). The record in this litigation indicates that when Equifax provided ASC with the computer software to obtain credit reports such as the October 25, 1993 report regarding Korotki, Equifax apparently provided ASC a copy of the FCRA.[19] That fact at least raises an inference that when Equifax collected the information, it anticipated that the information would be used, by ASC and/or others, for a proper purpose under the FCRA.[20] Moreover, a review of the three-page report itself suggests that at least some of the information in it was collected for the purpose of determining Korotki's eligibility for credit. The first page appears to refer solely to APK Development. The second two pages, however, appear to contain information regarding Korotki's individual bank accounts, mortgages and credit cards.

---

**18.** Counsel for plaintiff noted, in a letter to this Court dated February 29, 1996, that the parties stipulated to the fact that the report at issue in this case was a "consumer report." One or more defendants dispute that contention. *See* March 4, 1996 letter from counsel for defendants TRC and Schmitt. In any event, a court is generally not bound by parties' stipulations regarding issues of law. *Koch v. U.S. Dept. of Interior*, 47 F.3d 1015, 1018 (10th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995); *In re Lawson Square, Inc.*, 816 F.2d 1236, 1240–41 (8th Cir.1987); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1477 n. 1 (9th Cir.1986), *modified on other grounds*, 810 F.2d 1517 (1987); *Saviano v. C.I.R.*, 765 F.2d 643, 645 (7th Cir.1985). Whether the report at issue is a consumer report is a mixed question of fact and law. *Chandris, Inc. v. Latsis*, —— U.S. ——, ——, 115 S.Ct. 2172,

2190, 132 L.Ed.2d 314 (1995). Therefore, even if the parties stipulated that the report was a consumer report, this Court would not be bound by that stipulation to the extent that it involves an issue of law.

**19.** ASC's February 29, 1996 supplemental memorandum, Exhibit 2, Aff. of Korotki at 140–141.

**20.** As an attachment as Exhibit D to plaintiff's March 22, 1996 filing, plaintiff submitted an affidavit in support of plaintiff's position that the report at issue in this case is a consumer report. On March 29, 1996, defendants TRC and Schmitt moved to strike that affidavit. Plaintiff opposed that motion. Because this Court has resolved that issue without resort to the affidavit, the motion to strike that affidavit is moot.

On this record, this Court cannot say as a matter of law that none of the information in Korotki's report was collected for the purpose of establishing Korotki's eligibility for consumer credit. For that reason, for purposes of deciding defendants' summary judgment motion, it will be assumed that the report is a consumer report and that the FCRA therefore applies to its use.[21]

### B. Requirements of the FCRA

The legislative history of the FCRA indicates that Congress intended that statute "to protect consumers from inaccurate or arbitrary information in a consumer report, which is used as a factor in determining an individual's eligibility for credit, insurance or employment." 116 Cong.Rec. 36,572 (1970). Representative Sullivan, one of the FCRA's sponsors, stated that the FCRA "permit[s] the free flow of information about a consumer, while providing the consumer at the same time the ability to rectify any errors causing his unwarranted difficulties." *Id.* Plaintiff apparently takes the position that the main purpose of the FCRA is to protect consumers' privacy. However, as Representative Sullivan noted, the House "amendments seeking to protect individual privacy were rejected" by Senate members of the Conference Committee. *Id.* While privacy is one of the concerns Congress was apparently considering when it enacted the FCRA, that concern was balanced by Congress against the needs of the business ·community for information regarding consumers. Such balancing of various concerns is evident from the statute itself which states that the purpose of the FCRA is

> to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.

15 U.S.C. § 1681(b)

15 U.S.C. § 1681b allows a consumer reporting agency to furnish a consumer report, without the consumer's authorization, to a third party who has one of five purposes listed in § 1681b(3). That section provides in pertinent part that

> [a] consumer reporting agency may furnish a consumer report ... (3) to a person which it has reason to believe (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or *collection of an account of,* the consumer; or ... (E) otherwise has a legitimate business need for the information in connection with a business transaction involving the consumer.

(emphasis added).

Section 1681b appears to impose requirements only on consumer reporting agencies. The parties in this case dispute whether ASC is a consumer reporting agency

---

**21.** It may be possible to take the contrary position that the report is not governed by the FCRA because it was utilized for commercial purposes. Representative Sullivan, a sponsor of the FCRA, stated that the FCRA "does not apply to reports utilized for business, commercial, or professional purposes." 116 Cong.Rec. 36,572 (1972). Likewise, the Federal Trade Commission (FTC) has concluded that "[t]he FCRA does not cover reports furnished for transactions that consumers enter into primarily in connection with businesses they operate (e.g. a consumer's rental of equipment for use in his retail store)." 16 C.F.R. Part 600 App., at 387 (1995). That position however appears to conflict with the way some courts have defined a consumer report. *Comeaux v. Brown & Williamson Tobacco Co.,* 915 F.2d 1264, 1273–75 (9th Cir.1990) (*"If a consum-*

*er reporting agency provides a report based on a reasonable expectation that the report will be put to a use permissible under the FCRA, then that report is a 'consumer report' under the FCRA"* regardless of whether report is actually used for a business purpose) (emphasis in original); *Ippolito v. WNS, Inc.,* 864 F.2d 440, 453 (7th Cir. 1988) ("even if a report is used or expected to be used for a non-consumer purpose, it may still fall within the definition of a consumer report if it contains information that was originally collected by a consumer reporting agency with the expectation that it would be used for a consumer purpose"); *Heath,* 618 F.2d at 696. Because this Court concludes that defendants used the report for a permissible· purpose, and therefore did not violate the FCRA, this Court does not ·need further to explore that issue.

or a user of credit information.[22] That dispute does not require resolution, however, because the Fourth Circuit has concluded that users of consumer reports also must comply with § 1681b. *Yohay v. City of Alexandria Employees Credit Union,* 827 F.2d 967, 972 (4th Cir.1987) (Kaufman, J., sitting by designation).

> In *Hansen v. Morgan,* 582 F.2d 1214, 1216 (9th Cir.1978), the Ninth Circuit incorporated the criminal provisions of section 1681q into sections 1681n [Civil liability for willful noncompliance] and 1681o [Civil liability for negligent noncompliance] and held that a user who obtains a consumer report under false pretenses, as those words are used in section 1681q, can be civilly liable under either section 1681n or 1681o. In *Hansen,* Judge Carter wrote that "[t]he standard for determining when a consumer report has been obtained under false pretenses will usually be defined in relation to the permissible purposes of consumer reports which are enumerated in 15 U.S.C. § 1681b," *id.* at 1219 (footnote omitted), "that obtaining a consumer report ... without disclosing the impermissible purpose for which the report is desired can constitute obtaining consumer information under false pretenses."

*Id.* at 971–72. Thus, whether defendants are users or consumer reporting agencies, they could only obtain Korotki's report if they had a permissible purpose. To prove a violation of the FCRA, plaintiff must show that defendants had an impermissible purpose in obtaining the credit report or, in other words, that they lacked a permissible purpose. The only purpose which the record reflects that defendants had was to obtain an alternate address at which to serve Korotki. In this Court's view, that purpose is permissible under 15 U.S.C. § 1681b(3)(E); accordingly, defendants did not violate the FCRA.

■ One question which arises is the standard that a court should use to determine whether a user has shown that he or she has a permissible purpose under § 1681b. That provision requires that the

consumer reporting agency have "reason to believe" that the information it provides to a user will be used for one of the enumerated permissible purposes. The case law suggests that the burden on users is similar. For example, in *Zeller v. Samia,* 758 F.Supp. 775, 781–82 (D.Mass.1991), defendant had previously alleged that plaintiff owed him a debt and had obtained plaintiff's consumer report in connection with collection of that debt. The court concluded that that purpose in obtaining a consumer report was permissible, even though defendant merely had reason to believe plaintiff owed him a debt, and did not have conclusive proof of that fact. Likewise, in *Cambridge Title Co. v. Transamerica Title Insurance Co.,* 817 F.Supp. 1263, 1278 (D.Md.1992), *aff'd,* 989 F.2d 491 (4th Cir. 1993), defendant, who was plaintiff's principal, believed that $1.3 million had been misappropriated and obtained plaintiff's consumer report to determine whether plaintiff had misappropriated that money. Judge Harvey concluded that such purpose was permissible even though defendant apparently did not know, but only believed, that it could have been true that the money was missing. Thus, so long as a user has reason to believe that a permissible purpose exists, that user may obtain a consumer report without violating the FCRA.

### C. Defendants' liability regarding the FCRA

Section 1681b(3)(E) authorizes a person to obtain a consumer's credit report when that person "has a legitimate business need for the information in connection with a business transaction involving the consumer." Courts have interpreted § 1681b(3)(E) in different ways. For example, the Third Circuit concluded that a transaction lies within the business need exception when it relates to "one of the other specifically enumerated transactions in §§ 1681a(d) and 1681b(3), *i.e.,* credit, insurance eligibility, employment, or licensing." *Houghton v. New Jersey Mfrs. Ins. Co.,* 795 F.2d 1144, 1149 (3d Cir.1986). *See also Mone v. Dranow,* 945 F.2d 306, 308 (9th

---

**22.** However, the parties agree that defendants TRC and Schmitt are users, not consumer reporting agencies.

Cir.1991). Courts adopting such a restrictive approach reason that "a broad interpretation of the "business transaction" language of § 1681b(3)(E) would render the specificity of §§ 1681a(d) and 1681b(3) meaningless." *Houghton*, 795 F.2d at 1149. Other courts have adopted a less restrictive interpretation of that section. *Hovater v. Equifax, Inc.*, 823 F.2d 413, 419 (11th Cir.1987); *Cambridge*, 817 F.Supp. at 1278; *Houghton*, 795 F.2d at 1150 (Sloviter, J., concurring). *See also* Elwin Griffith, *The Quest for Fair Credit Reporting and Equal Credit Opportunity in Consumer Transactions*, 25 U.Mem. L.Rev. 37, 51–62 (1994) (discussion of various interpretations of § 1681b(3)(E)).

Even under the narrowest interpretation of § 1681b(3)(E), defendants in this case had a permissible purpose to obtain Korotki's consumer report because the business transaction involved here related to § 1681b(3)(A), one of the other purposes specifically enumerated by § 1681b(3), which authorizes a person attempting to collect an account of a consumer to obtain the consumer's credit report. Angelozzi, and those working for him, apparently believed that the debt was owed by Korotki, the consumer,[23] or by APK Development.[24] Thus, § 1681b(3)(A) would appear to provide sufficient authority for defendants' actions. However, even if that not be so, the business transaction giving rise to the alleged debt involved Korotki, thus bringing the matter under and within § 1681b(3)(E).

In this case, Korotki testified that he asked Angelozzi to perform certain compaction services whether or not those services were already included in Angelozzi's contract with the County. Korotki further testified that he agreed, if the County was not obligated so to pay, to pay $12,000 in the form of a certain car in return for Angelozzi's performing those services. Korotki does not withdraw those statements but now claims that he has never had any "personal business relationship" with Angelozzi.[25] The parties apparently dispute whether, on those facts, a business relationship involving Angelozzi and Korotki existed. That dispute does not prevent the entry of summary judgment, however, because it is not a relevant dispute. This Court is not required in this case to determine whether such a business relationship in fact existed. Instead, this Court need only determine whether Angelozzi had reason to believe that such a relationship existed. *See Zeller v. Samia*, 758 F.Supp. 775, 781 (D.Mass.1991). In that context, this Court concludes that the agreement between the two parties, to which plaintiff admits, gave Angelozzi reason to believe that Korotki and/or APK Development owed Angelozzi a debt. For that reason, Angelozzi was entitled to attempt to collect the debt and to hire Schmitt and TRC to do so. *See Baker v. Bronx–Westchester Investigations, Inc.*, 850 F.Supp. 260, 262–63 (S.D.N.Y.1994) (private detective acting on behalf of judgment creditor was entitled to obtain judgment debtor's consumer report); 16 C.F.R. Pt. 600 App. at 392 ("An attorney collecting a debt for a creditor client, including a party suing on a debt or collecting on behalf of a judgment creditor or lien creditor, has a permissible purpose to obtain a consumer report on the debtor to the same extent as the client."). Moreover, it appears that Schmitt and TRC,

23. The FCRA defines a consumer merely as "an individual." § 1681a(c). The statute does not limit the definition of a consumer to consumer purposes. Elwin Griffith, *The Quest for Fair Credit Reporting and Equal Credit Opportunity in Consumer Transactions*, 25 U.Mem.L.Rev. 37, 58 (1994). This definition is in contrast to Congress' explicit definition of a consumer in the Truth in Lending Act as a natural person involved in a credit transaction for personal, family or household purposes. 15 U.S.C. § 1602(h). Under the FCRA's definition of a "consumer," this Court concludes that Korotki is a consumer, and entitled to assert what a "consumer" may assert under the FCRA.

24. Schmitt testified that Angelozzi's contract was with APK Development and not with Korotki. TRC's and Schmitt's January 5, 1996 motion for summary judgment, Ex. 3, Dep. of Schmitt at 40. However, the record contains certain indications that Korotki, personally, may have been a party to the alleged contract. *Id.*, at ¶¶ H, I. That may involve an issue of law, or of mixed law and fact, which has not been fully briefed by the parties. However, because this Court concludes that defendants, in any event, have a permissible purpose under § 1681b(3)(E), it is not necessary to resolve that issue.

25. Plaintiff's January 5, 1996 Supplemental Memorandum, Exhibit L, Aff. of Korotki at ¶ 16.

in turn, were entitled to hire ASC to aid in the collection effort.

Plaintiff argues that ASC did not have a permissible purpose because ASC admitted that Schmitt never asked ASC to collect the debt, but only asked ASC to post a mechanic's lien and, later, to serve Korotki personally. In *Baker*, 850 F.Supp. 260 (S.D.N.Y. 1994), the plaintiff made a similar argument. That court stated:

> For purposes of 15 U.S.C. § 1681b, we find no material distinction between the hiring of an investigator to actually collect a judgment, and the hiring of an investigator to locate the debtor so that judgment may thereafter be collected. This is clear in light of the language of § 1681b that a report may be issued for the 'review or collection of an account.'

*Id.* at 262 n. 5. Likewise, this Court finds no material distinction between the hiring of ASC to collect a debt and the hiring of ASC to establish a mechanic's lien or effect service so that the debt "may thereafter be collected." *Id.*

Plaintiff asserts that, if this Court grants summary judgment to defendants, such a ruling will allow any claimant asserting a monetary claim against another person to obtain that person's consumer report without violating the FCRA. Plaintiff's assertion is incorrect because asserting a monetary claim and collecting a debt present two different situations. For example, in *Mone v. Dranow*, 945 F.2d 306 (9th Cir.1991), the plaintiff quit employment with the defendant and established a competing firm. The defendant, in an earlier action, sued the plaintiff, alleging unfair competition. Before filing that suit, the defendant obtained the plaintiff's credit report in order to determine whether plaintiff had sufficient assets to pay the judgment demanded in defendant's complaint. When plaintiff learned of defendant's acquisition of the credit report, plaintiff sued defendant, alleging violations of the FCRA. The

Ninth Circuit concluded that defendant violated the FCRA, in part because defendant was not involved in a credit transaction with the plaintiff and did not have a permissible purpose under the FCRA to obtain plaintiff's consumer report. *Id.* at 308. *Mone* is distinguished, however, from the instant case in which it is undisputed that Korotki offered to pay Angelozzi for certain construction services. Furthermore, Angelozzi had at least some reason to believe Korotki and/or APK Development owed him a debt. Those facts indicate a credit transaction and are sufficient to create a permissible purpose under the FCRA.

 Plaintiff also argues that, assuming defendant ASC only needed another address at which to serve plaintiff, ASC could have obtained that address by running a less intrusive credit check. ASC responds that the less intrusive reports would not have provided an additional address. Even assuming ASC could have obtained the information it needed from a less comprehensive summary, the FCRA does not limit authorized users' access to credit information. A user who has a permissible purpose may obtain a consumer report.[26] Plaintiff offers no authority for his contrary position that the FCRA requires a user to obtain the least intrusive report containing the information sought. Because this Court concludes that defendants had a permissible purpose, they did not violate the FCRA by ordering what plaintiff refers to as a full credit report.[27] That defendants may not have needed the credit information included in that report, but only an additional address at which to service Korotki, does not change that result.

 Finally, plaintiff argues that once the period for establishing the mechanic's lien had expired, serving Korotki personally with papers regarding that lien would have no effect. Assuming without deciding that that proposition is accurate, it was neverthe-

---

**26.** The FCRA does limit use of an "investigative consumer report", defined in § 1681a(e) as a consumer report in which the information is obtained through personal interviews with the consumers' neighbors, friends or associates. *See* § 1681d "Disclosure of investigative consumer reports." However, in any event, plaintiff does not assert in any of his pleadings that the report at issue in this case is an investigative consumer report.

**27.** Plaintiff's November 22, 1995 cross-motion for summary judgment at 5.

less reasonable for Schmitt to pursue personal service if he believed at the time that such service would preserve rights of his client which would otherwise be lost. The record reflects that Schmitt did so believe.[28] The defendants, having produced evidence of a permissible purpose, are entitled to summary judgment unless plaintiff, who bears the burden of going forward to show lack of a proper purpose, produces some evidence upon which a jury could find to the contrary. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Plaintiff has not offered any bad faith reason for which Schmitt might have obtained the credit report. Plaintiff appeared merely to speculate during the December 29, 1995 hearing that Schmitt might be untruthful and that his credibility was an issue for the jury. Such a response is insufficient to survive summary judgment. *Smith v. First National Bank of Atlanta,* 837 F.2d 1575, 1580 (11th Cir.1988) (summary judgment in favor of defendant appropriate in privacy claim arising from same facts as FCRA claim because plaintiff produced no evidence that defendant acted in bad faith) (decision of district court included as an appendix to 11th Circuit's opinion); *Zeller v. Samia,* 758 F.Supp. 775, 782 (D.Mass.1991) (plaintiff who introduced no evidence indicating that defendant's use of consumer credit report was for any other reason than in connection with a business transaction with plaintiff did not survive summary judgment).[29] Furthermore, plaintiff cannot get to the jury simply because he hopes that "the jury will disbelieve the evidence that the summary judgment movant has adduced." *Wilson v. Clancy,* 747 F.Supp. 1154, 1158 (D.Md.1990). *See also DF Activities Corp. v. Brown,* 851 F.2d 920, 922 (1988) ("A plaintiff cannot withstand summary judgment by arguing that although in pretrial discovery he has gathered no evidence of the defendant's liability, his luck may improve at trial.").

While it is true that credibility determinations are for the jury, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), plaintiff must "produce some fact to shake the credibility" of defendants' witnesses. *Schoonfield v. Mayor and City Council of Baltimore,* 399 F.Supp. 1068, 1078 (D.Md.1975). Plaintiff has not done so here. For that reason, defendants are entitled to summary judgment.

Judge Harvey's decision in *Cambridge Title Co. v. Transamerica Title Ins. Co.,* 817 F.Supp. 1263, 1278 (D.Md.1992), *aff'd,* 989 F.2d 491 (4th Cir.1993), provides further support for this Court's conclusion that defendants in this case did not violate the FCRA. In *Cambridge,* plaintiffs were a title company and its principal officer, Henry Louis. Cambridge Title Company did not underwrite the risks insured by the policies it issued but contracted with defendant Transamerica Title Insurance Company for such underwriting. Cambridge eventually became Transamerica's agent. Plaintiff Louis alleged that Transamerica violated the FCRA and the CCRAA by obtaining two credit reports on Louis. Transamerica had obtained one report "pursuant to regular credit checks undertaken by Transamerica concerning a person like Louis who was the principal of one of Transamerica's agents." *Id.* at 1278. The other report Transamerica obtained to determine whether Louis had converted $1.3 million that was believed to be missing from Cambridge's escrow accounts for his personal use. Judge Harvey concluded that both of

28. TRC's and Schmitt's January 5, 1996 motion for summary judgment, Ex. 3, Dep. of Schmitt at 27–37.

29. *Cf. Yohay,* 827 F.2d 967, 969, 972 (court concluded that ex-wife who testified that she obtained her ex-husband's credit report to ensure that he was no longer using joint credit arrangements obtained that report under false pretenses); *Hansen v. Morgan,* 582 F.2d 1214, 1216–17, 1221 (plaintiff who alleged that defendants obtained plaintiffs' credit report in order to determine whether one plaintiff used improper financing procedures during an election campaign survived summary judgment).

It may be that summary judgment is seldom appropriate when state of mind is at issue. *Magill v. Gulf and Western Industries, Inc.,* 736 F.2d 976, 979 (4th Cir.1984) (record contained conflicting evidence regarding state of mind issue); *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) (same). Defendants are nevertheless entitled to summary judgment in this case because plaintiff has neither produced nor proffered any evidence that Schmitt, or any other defendant, acted in bad faith.

Transamerica's purposes were legitimate business purposes within the meaning of § 1681b(3)(E).

Plaintiff attempts to distinguish *Cambridge* by noting that Judge Harvey relied on the fact that the parties in *Cambridge* had an existing business relationship. Plaintiff then argues that he and Angelozzi did not have a business relationship in October, 1993 when ASC obtained plaintiff's consumer report. According to plaintiff, if such a relationship existed at all, it ended on July 7, 1993 when Angelozzi completed its work at Old Court Village. However, a business relationship does not end when the work contracted for is completed, but only when both performance and payment are satisfactorily accomplished and completed. In effect, plaintiff is arguing that one party to a business relationship can terminate that relationship by refusing to pay an alleged debt. Clearly that is not the case.

### D. State law statutory and common law counts

▮ Because the FCRA and the CCRAA are virtually identical, this Court concludes that defendants violated neither statute. *See Cambridge*, 817 F.Supp. 1263, 1278 (D.Md. 1992). Regarding plaintiff's claim for invasion of privacy, this Court notes § 1681t which states:

> This subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to the collection, distribution, or use of any information on consumers, except to the extent that those laws are inconsistent with any provisions of this subchapter, and then only to the extent of the inconsistency.

The FCRA authorizes defendants' actions in this case. If Maryland tort law imposed such liability for those actions, that law would be inconsistent with the FCRA and, therefore, § 1681t would preempt that law.

▮ Moreover, Maryland, in defining the torts relating to invasion of privacy, looks to the Restatement (Second) of Torts § 652B. *Lawrence v. A.S. Abell Co.*, 299 Md. 697, 700–701, 475 A.2d 448 (1984); *Hollander v. Lu-*

*bow*, 277 Md. 47, 53–55, 351 A.2d 421 (1976), *cert. denied*, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976); *New Summit Associates v. Nistle*, 73 Md.App. 351, 360, 533 A.2d 1350 (1987). According to the Restatement, a person who intentionally intrudes upon the private affairs of another is liable to the other "if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. Because Maryland law, specifically the CCRAA, authorizes intrusion upon plaintiff's affairs to the extent which occurred in this case, such intrusion, as a matter of law, is hardly highly offensive to a reasonable person.

Finally, because this Court concludes that none of the defendants are liable to plaintiff, defendant ASC's third party claims against Schmitt and TRC, and Schmitt and TRC's third party claims against ASC, are moot.

### IV. Conclusion

For the reasons stated above, this Court will enter summary judgment in favor of all defendants on all of plaintiff's claims against them in a separate Order of even date herewith and, in that Order, deny, or treat as moot, all other pending motions.